

# THE ATTORNEY GENERAL
## OF TEXAS

AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

July 30, 1949.

Hon. M. H. Crabb, M.D.          Opinion No. V-867.
Secretary
Texas State Board of        Re: Questions relating to H.B.
Medical Examiners               103 and H.B. 915, Acts of
Fort Worth 2, Texas             51st Leg., 1949, commonly
                                referred to as "Basic
                                Science Law."

Dear Dr. Crabb:

Your request for an opinion relating to House Bills 103 and 915, Acts of the 51st Legislature, more commonly referred to as the Basic Science Law, is as follows:

" . . . In carrying out the customary and statutory provisions of the Medical Practice Act of Texas, the Texas State Board of Medical Examiners obtained by letter the graduation dates of the three medical schools of Texas, and at its meeting on November 28, 1948, the Board set June 16, 17, 18, 1949, as the next examination session for license to practice medicine in Texas. These dates and the place of the examination were forwarded to all medical and osteopathic journals for publication, and all schools. The medical schools of Texas had their graduation on June 6th, 10th and 13th, 1949, and by July 1st each graduate had to be in internship, which duty will take them into most all states of the United States as well as the Canal Zone. Thus the necessity of holding the examination on the specified dates.

"During the present session of the Legislature, House Bill No.103 was enacted and provided, among other things, for the non-repeal of existing medical licensure laws. It was the general impression that the law was to go into effect ninety (90) days after adjournment of the Legislature, which is now in session.

Proceeding under the impression that H. B. No.
103 was not in effect, and since no Basic Sci-
ence Board had been appointed or organized,
the Texas State Board of Medical Examiners
went into executive and examination session at
Gregory Gymnasium, The University of Texas in
Austin, at 8:00 A.M. June 16th, 1949. During
the course of the afternoon of June 17th, it
was called to the attention of the Board that
there was a possibility H. B. No. 103 was in
effect at that time; however, the Board con-
tinued to hold its examination session for the
examinees. It had already approved approxi-
mately 200 applications for license to prac-
tice medicine by reciprocal endorsement with
other states. . . ."

You have submitted several questions which,
for the sake of clarity will be stated and answered sep-
arately.

Question No. 1. "Was House Bill No. 103
in effect on June 16, 17, and 18, 1949? If
so, when did it go into effect?"

Section 39 of Article III of the Constitution
of Texas provides:

"No law passed by the Legislature, ex-
cept the general appropriation act, shall take
effect or go into force until ninety days af-
ter the adjournment of the session at which it
was enacted, unless in case of an emergency,
which emergency must be expressed in a pream-
ble or in the body of the act, the Legislature
shall, by a vote of two thirds of all the mem-
bers elected to each House, otherwise direct;
said vote to be taken by yeas and nays, and
entered upon the journals."

In the case of Ex Parte May, 118 Tex. Cr. 165,
40 S.W.2d 811 (1931), the Court of Criminal Appeals held
that a substitute bill different from the original bill
and not passed by a record vote showing concurrence of
two-thirds of the Legislature was ineffective as an emer-
gency measure and that the power to make an emergency
measure must be exercised when the Legislature becomes

aware of the terms contained in the bill as finally agreed upon and passed. This case was followed by the Supreme Court of Texas in the case of Caples v. Cole, 129 Tex. 370, 102 S.W.2d 173 (1937), wherein the Supreme Court said:

"In the May Case the Court of Criminal Appeals held, in substance, that a substitute bill, different from the original bill, and not passed by a record vote showing concurrence of two-thirds of the legislature, was ineffective as an emergency measure; and that the power to make an emergency measure must be exercised when the Legislature becomes aware of the terms contained in the bill as finally agreed upon and passed. The Court of Civil Appeals followed the rule announced by the Court of Criminal Appeals in the May Case, and held that the vote upon the amendments, and not the vote upon the original bill, would control . . .

"It is clear that the object of the provision of the Constitution above quoted is that if a bill is to take effect immediately on its passage, it must contain an emergency clause and such bill must be passed by a vote of two-thirds of all the members elected to each house, and such vote to be taken by yeas and nays and entered upon the journals. We think the rule prescribed by the Constitution also applies to amendments and reports of conference committees . . ."

House Bill 103, Acts of the 51st Legislature, passed the House originally on March 14, 1949, by 93 yeas and 43 nays, two present not voting. It was amended by the Senate and passed April 21st, 1949 with 23 yeas and 3 nays. Upon return to the House, the House concurred in the Senate amendments on April 25, 1949, by 113 yeas and 8 nays, three present not voting. House Bill 103 was signed by the Governor on April 28, 1949, and therefore became effective on the same date.

On May 5, 1949, House Bill 915 which amended certain sections of House Bill 103 passed the House by a viva voce vote. It was passed by the Senate on May 12, 1949, by 31 yeas and 0 nays. House Bill 915 was approved

by the Governor on May 27, 1949, and it therefore becomes effective 90 days from the date of adjournment of the Legislature, or more specifically, October 5, 1949. On June 5, 1949, the House passed House Concurrent Resolution No. 175 which directed that House Bill No. 915 go into effect immediately upon the adoption of the resolution by a two-thirds vote of the House of Representatives and the Senate and upon the approval of the Governor of the State of Texas. It is to be noted that House Concurrent Resolution No. 175 does not change the effective date of House Bill 915 inasmuch as a concurrent resolution of the Legislature cannot have the effect of amending a statute so as to change its effective date. Moshiem v. Rollins, 79 S.W.2d 672 (Tex. Civ. App. 1935); Caples v. Cole, supra; State v. Delesdenier, 7 Tex. 76 (1851).

The scope or function of a "resolution" as distinguished from a "bill" is adequately stated by Chief Justice Gaines in the case of San Antonio v. Micklejohn, 89 Tex. 79, 33 S.W. 735 (1895), as follows:

". . . A resolution proper is not a law. State v. Delesdenier, 7 Tex. 76. A legislative body may in that form express an opinion, may govern its own procedure within the limitations imposed upon it by its constitution or charter, and, in case it have ministerial functions, may direct their performance; but it cannot adopt that mode of procedure in making laws where the power which created it has commanded that it shall legislate in a different form."

In the case of Conley v. Texas Division of United Daughters of the Confederacy, 164 S.W. 24 (Tex. Civ. App. 1913, error ref.), the court stated:

"The chief distinction between a resolution and a law is that a resolution is used whenever the Legislature wishes to merely express an opinion which is to have only a temporary effect, while a law is intended to permanently direct and control matters applying to persons or things in general."

This office has consistently held that a House Concurrent Resolution cannot change the effective date

of legislation inasmuch as the requirements of the Constitution are not met by this method of legislation. Attorney General's Opinion No. 0-95, dated January 13, 1939; Attorney General's Opinion No. 0-1717, dated December 23, 1939; Attorney General's Opinion No. 0-3697, dated August 14, 1941. It is readily seen that House Concurrent Resolution 175 did not have the effect of placing House Bill 915 into immediate effect as anticipated.

In answer to your question No. 1, it is our opinion that House Bill No. 103 is now in effect, the effective date being April 28, 1949, the date of the signature by the Governor, and that House Bill 915 will become effective on October 5, 1949.

Question No. 2. "If you have answered Question No. 1 in the affirmative, what effect will this have on the examination held on June 16, 17, 18, 1949?"

Section 1 of House Bill 103, Acts of the 51st Legislature, 1949, provides in part that no person shall be permitted to take an examination for a license to practice the healing art or any branch thereof, or be granted any such license, unless he has presented to the board or office empowered to issue such a license as the applicant seeks, a certificate of proficiency in the basic sciences. Section 6 of said Act provides that the board shall conduct examirations at such times and places as it deems best provided that the first examinat m shall be held within six months of the effective dat of this Act and examination to be held during each period of six months thereafter. By reason of the plain provisions of the law, whether directory or mandatory, the board should in all cases require a certificate of proficiency in the basic sciences before examination under the Medical Practice Act is given to any applicant. However, your request presents the additional question of whether examinations inadvertently begun but not graded (and no licenses issued thereon) would be a nullity if the Board should now require basic science certificates before completing the examinations by grading them. The real question is whether licenses issued upon such examinations would be void.

We believe that the answer to this question is found in the general intent of the Act that no person

should practice the healing arts before satisfying the basic science requirements. At the time of the regular graduation of this large class in June, 1949, and at the time of the regularly scheduled medical examination, there was no Basic Science Board in existence. The members of such Board were not in fact appointed until July 23, 1949. So it was impossible for the applicants to procure such certificates. Your Board proceeded with the examinations but has withheld the grading thereof and the issuance of licenses until the Bas.c Science Board was appointed. It is now in existence and can act on applications for Basic Science Certificates. If you now require such certificate of each applicant before proceeding to grade his examination and before issuing his license, it is our opinion that such action and license would not under these particular circumstances be void, and a person so licensed would not be subject to any penalties under the Act.

Question No. 3. "If you have answered Question No. 1 in the affirmative, and in the absence of a Basic Science Board, can this Board proceed with the grading of the papers and issue license to the successful examinees of the June 16, 17, 18, 19, 1949, examination, without a basic science certificate?"

In answer to your question No. 3 it is our opinion that the board should require a certificate of proficiency in the basic sciences of applicants taking the examination on June 16, 17, 18, and 19, 1949, before grading the examination papers and issuing licenses thereon. Therefore, your question is answered in the negative.

Our answers to questions Nos. 2 and 3 also answer your question No. 4.

Question No. 5. "If you have answered Question No. 1 in the affirmative, what effect will this have on the applicants whose applications for license by reciprocal endorsement were approved on June 17th? License certificates were signed on June 17th for approximately 200 applicants, and are now ready to be sent out, should the Board send out these license certificates without having obtained a basic science certificate,

even though there is no Board of Basic Science Examiners to issue a basic science certificate?"

Since receiving your request for opinion, you have advised that this question should be limited to those applicants who filed after the effective date of the Act, since action had already been taken on those which were filed before such date. On applications, filed, and obviously to be acted upon after the effective date, April 28, 1949, House Bill 103 clearly requires certificates of proficiency in the basic sciences before the issuance of licenses to practice. Since the Basic Science Law indicates that no license shall be issued before obtaining a certificate of proficiency and since no examination for admission by reciprocity is required, it is our opinion that the Board of Medical Examiners may hold in abeyance the applications of those to be admitted to practice the healing arts by reciprocity until such time as the applicants may obtain from the Basic Sciences Board the certificates of proficiency required by law. Upon receipt of such certificates of proficiency in the basic sciences by the Board of Medical Examiners such Board would be authorized to issue all licenses which were signed on June 17th by virtue of reciprocal agreements.

You have indicated that an answer to question No. 6 is no longer necessary.

Question No. 7. "We understand there was an amendment to the H. B. No. 103 exempting veterans. Will veterans be required to obtain a certificate of proficiency in the basic sciences before they are eligible for licensure by examination or reciprocal endorsement? If they are exempt from the requirements of the basic science certificate, what form of evidence should this Board require of veterans, if it be required to obtain evidence in order to know that the applicant is entitled to the exemption under the clause exempting veterans?"

Section 23a of House Bill 915, Acts of the 51st Legislature, 1949, provides that the Basic Science Act shall not apply to graduates of the schools of healing arts who have been enrolled in their respective schools for at least one year prior to the time this Act becomes law and who have attended said schools under the

G. I. Bill of Rights and were bona fide residents of the State of Texas at the time they entered the military service, with a further provision that Section 23a shall not apply to any person who entered the military service after January 1, 1946. As previously stated, House Bill 915 will not become effective until 90 days after the date of adjournment of the Legislature, the effective date being October 5, 1949. Therefore, veterans must obtain certificates of proficiency in the basic sciences before they are eligible for licensure by examination or reciprocal endorsement at the present time. However, after October 5 any veteran coming within the provisions of Section 23a of House Bill 915 will be exempt from such requirement.

## SUMMARY

House Bill 103, Acts of the 51st Legislature, 1949, commonly referred to as the "Basic Science Law," having received the required two-thirds vote, became effective upon the signature of the Governor on April 28, 1949. House Bill 915, Acts of the 51st Legislature, 1949, which amended certain sections of House Bill 103, will be effective October 5, 1949, 90 days after the adjournment of the Legislature, having failed to receive the required constitutional vote. Applicants for license to practice the healing art or any branch thereof must obtain certificates of proficiency in the basic sciences from the Board of Examiners in the Basic Sciences after April 28, 1949, the effective date of said Act. The certificate of proficiency should be required before examination for a license to practice the healing arts, but licenses issued upon examinations begun before certificates are furnished, but completed by grading after the filing of the certificates, would not be void.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By Burnell Waldrep
Assistant

APPROVED

Price Daniel
ATTORNEY GENERAL

BW:bh